UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Arkansas Public Employee
Retirement System *et al.*

    v.                                    Civil No. 08-cv-312-JL
                                                Opinion No. 2009 DNH 149
GT Solar International,
Inc. *et al.*

#### OPINION AND ORDER

Defendant GT Solar International, Inc., a New Hampshire-
based manufacturer of furnaces and other equipment used to make
components for solar power, or photovoltaic, systems, raised $500
million in its initial public offering ("IPO") on July 24, 2008.
Early the next morning, however, GT Solar's biggest customer
announced that it had signed a contract to purchase its furnaces
from one of GT Solar's competitors; that day, after the United
States market opened, GT Solar's stock fell by 24 percent from
the price it fetched in the IPO the day before.

An investor who purchased GT Solar shares in the IPO,
plaintiff Arkansas Public Employee Retirement System, brought
this putative class action against GT Solar, a number of its
directors and officers, the investment banks that underwrote the
IPO, and the venture capital firms that own a controlling
interest in GT Solar.  The plaintiff alleges that the defendants'
failure to disclose, in the registration statement or prospectus

accompanying the IPO,[1] the "substantial likelihood" that GT
Solar's biggest customer would stop buying its furnaces from GT
Solar, among other facts, violated §§ 11 and 12(2) of the
Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2).  The
defendants have moved to dismiss the consolidated class action
complaint, arguing that it fails to state a claim for relief.
See Fed. R. Civ. P. 12(b)(6).

        This court has subject-matter jurisdiction under 28 U.S.C.
§ 1331 (federal question).  After oral argument, and for the
foregoing reasons, the defendants' motion to dismiss is denied.
As explained fully infra, the plaintiff need not allege that the
defendants knew, or even that they should have known, of the
substantial likelihood that GT Solar's biggest customer would
take its business elsewhere, and the failure to disclose that
risk in the prospectus could have rendered certain statements it
did contain misleading in violation of §§ 11 and 12(2).


**I.    Background**

        In ruling on the defendants' motion to dismiss for failure
to state a claim, the court accepts the allegations of the

_____

        [1]Because the registration statement is simply a completed
form attaching the prospectus--which is the document containing
all of the statements at issue here--this order will refer to the
documents together as the "prospectus."

complaint, including those that follow, as true.  See, e.g., Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 324 (1st Cir. 2008).  The court has also culled facts from the public documents submitted by the parties, chiefly GT Solar's registration statement and prospectus.  See N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 43 (1st Cir. 2008).

One of GT Solar's principal products is its directional solidification systems ("DSS") furnace, used to melt and cast multicrystalline ingots from which solar wafers are manufactured. Sales of DSS units accounted for at least 85 percent of GT Solar's revenues in both its 2007 and 2008 fiscal years, and more than 70 percent of its revenue in the 2006 fiscal year.  During these years, one of GT Solar's biggest customers was LDK Solar Co., Ltd., which had placed orders with GT Solar for more than 250 of its DSS furnaces by the end of the 2007 calendar year. (By comparison, GT Solar had delivered just 620 DSS furnaces to all of its customers in the three years preceding the IPO.)  LDK, in fact, accounted for 62 percent of GT Solar's revenue in the 2008 fiscal year.

But LDK issued a press release in the early morning hours of July 25, 2008--the day following the IPO--that LDK had entered into a contract to buy furnaces used in manufacturing multicrystalline ingots from JYT Corporation, a competitor of GT

3

Solar based in China.  The press release announced that delivery of the furnaces would commence in 2008, extending through 2010, and that LDK was "granted the exclusive right by JYT in purchasing and using this new equipment for the contract period." After the United States stock market opened on the day of LDK's press release, GT Solar's share price fell to a low of $9.30 before closing at $12.59, as the stock traded at a volume 15 times its average between then and the commencement of this action.  The share price in the IPO, just the day before LDK's press release, had been $16.50, so GT Solar's stock had lost nearly 24 percent of its market value.

Aside from this chronology, the plaintiff has alleged a number of facts that, in its view, further support the inference that GT Solar knew, at the time of the IPO, of a "substantial likelihood"--if not an absolute certainty--that LDK would choose another supplier of DSS furnaces.[2]  These allegations are based on information from "confidential witnesses" who worked at GT

---

[2]At oral argument, the defendants asserted that the plaintiff had conceded their lack of actual knowledge that LDK would not renew its contract with GT Solar.  But what the plaintiff conceded--as it clarified at oral argument--is that it has not <u>alleged</u> actual knowledge at this point.  That is not the same as conceding that the defendants had no actual knowledge. In any event, the defendants' knowledge, actual or constructive, is not an element of the plaintiff's prima facie case, <u>see</u> <u>infra</u> Part II.B.1, so the dispute is irrelevant anyway.

Solar in the months and, in some cases, years, before the IPO.
Among other happenings, these witnesses related:  having seen a
presentation, also reviewed by the chief executive officer and
the board of directors, "that indicated JYT was growing and
threatening GT Solar's business"; having heard that LDK "was
looking around the industry to buy furnaces from other companies"
besides GT Solar; and that GT Solar employees had "raised
concerns that LDK was 'upset' with GT Solar's products,"
including an instance where the witness himself had gone directly
to the company's vice president of customer support.[3]

Despite these goings-on, the prospectus accompanying the IPO
contained certain statements that, in the plaintiff's view,
created the misleading impression that GT Solar would experience
continued success in selling its DSS furnaces to LDK.  In
particular, the plaintiff identifies the following:

- "We believe our DSS unit is a market leading product."

- "*Leading market position in specialized furnaces
  essential for the production of multicrystalline solar
  wafers*.  We believe our DSS units are the most widely

---

[3]The defendants point out, though, that LDK's 2007 annual
report, filed on April 7, 2008, noted some "$278.6 million in
purchase obligations to GT Solar[,] primarily for DSS furnaces to
be delivered in 2008 and 2009," as well as that LDK was "engaged
in research and development efforts in collaboration with GT
Solar to increase the number of [multicrystalline] wafers that
can be produced per standard ingot."

5

used furnace for casting multicrystalline ingots in the solar industry."

- "Since 2004 we have delivered over 620 DSS units.  We believe our installed base of DSS units and other [photovoltaic] equipment promotes recurring sales of additional equipment because of the high cost associated with changing equipment suppliers."

- "During the fiscal year ended March 31, 2008, one customer, LDK Solar Co., accounted for 62% of our revenue."

For their part, however, the defendants identify a number of other statements in the prospectus which, from their perspective, dispel any impression that GT Solar would necessarily maintain its lucrative relationship with LDK.  First, they note that GT Solar disclosed the "risk that existing customers will elect not to do business with us in the future," magnified by the fact that "we depend on a small number of customers for a substantial part of our sales and revenue."  Second, the defendants point to a similar warning about GT Solar's reliance on a limited number of products, particularly its DSS furnaces; the prospectus cautioned, "There can be no assurance that DSS sales will increase beyond, or be maintained at past levels.  Factors affecting the level of future DSS sales include factors beyond our control, including . . . competing product offerings by other

[photovoltaic] manufacturers."[4]  Third, the prospectus mentioned

that GT Solar "may face product liability claims" and "may face

significant warranty claims" arising out of its DSS products.


## II.  <u>Applicable legal standard</u>

The defendants have raised two arguments as to the correct

standard for deciding their motion to dismiss.  First, they say

that Rule 9(b) of the Federal Rules of Civil Procedure, which

requires that "[i]n alleging fraud . . . , a party must state

with particularity the circumstances constituting fraud," applies

here.  That is not correct.

"Fraud is not an element of a claim under either Section 11

or 12(2), and a plaintiff asserting such claims may avoid

altogether any allegations of scienter or reliance."  <u>Shaw v.</u>

<u>Digital Equip. Corp.</u>, 82 F.3d 1194, 1223 (1st Cir. 1996).  The

court of appeals did note in <u>Shaw</u> that "a complaint asserting

violations of those statutes may yet sound in fraud," e.g., "if a

plaintiff were to attempt to establish violations of Sections 11

and 12(2) as well as the anti-fraud provisions of the Exchange

Act through allegations in a single complaint of a unified course

_____

[4]The prospectus also stated, elsewhere, "We face competition
from other manufacturers of equipment for [photovoltaic]
products."

7

of fraudulent conduct," with the result that "Rule 9(b) would probably apply to the Sections 11, 12(s), and Rule 10b-5 claims alike."[5] <u>Id.</u> But the plaintiff has not chosen that course here, bringing claims under §§ 11 and 12(2) only, and premising those claims on nondisclosures, rather than on false statements.

Furthermore, the defendants' argument that Rule 9(b) nevertheless applies because the plaintiff alleges that they made "knowing omissions" or "concealed" facts in the prospectus, <u>but see</u> note 2, <u>supra</u>, was squarely rejected in <u>Shaw</u>.[6] There, the court of appeals ruled that a complaint under §§ 11 and 12(2) alleging "that defendants actually possessed the information that they failed to disclose" does not trigger Rule 9(b), "absent any claim of scienter and reliance. Otherwise, any allegation of nondisclosure of material information would be transformed into a claim of fraud for purposes of Rule 9(b)." 82 F.3d at 1223. So

_____

[5]As the Supreme Court has noted, "a § 10(b) plaintiff carries a heavier burden than a § 11 plaintiff. Most significantly, he must prove that the defendant acted with scienter, i.e., with intent to deceive, manipulate, or defraud." <u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375, 383 (1983) (footnote omitted).

[6]The defendants also argue that the plaintiff alleges "a knowingly false statement," but that is inaccurate--as well as inconsistent with the defendants' argument that the plaintiffs have conceded they allege no false statement.

Rule 9(b) does not apply in this case of alleged nondisclosures, as the defendants more or less conceded at oral argument.

Second, the defendants argue that the complaint does not pass muster even under the lower pleading standard of Rule 8, requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), as that standard has been illuminated by the recent decisions of the Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).  The defendants maintain that the complaint does not allege what they characterize as "plausible grounds to infer" that they knew at the time of the IPO what they are accused of failing to disclose: the "substantial likelihood" that LDK would stop purchasing DSS furnaces from GT Solar.  Putting aside the fact that, as discussed infra at Part III.B.1, a plaintiff need not allege that the defendants knew, or even had reason to know, of the allegedly nondisclosed information to make out a claim under §§ 11 or 12(2), the defendants take too stringent a view of federal pleading standards, even post-Twombly/Iqbal.

While Twombly and Iqbal hold that "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face,'" this "standard is not akin to a 'probability requirement,' but it asks for more than a

9

sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570). Or, stated in the positive, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (emphasis added). At most, then, those cases suggest that if the facts alleged in a complaint could support either an inference of wrongdoing or an "'obvious alternative explanation'" then the plausibility standard requires the court to choose the "obvious alternative explanation."[7] Iqbal, 129 S. Ct. at 1951-52 (quoting Twombly, 550 U.S. at 567).

Here, as explained infra, the plaintiff's factual allegations do not make "obvious" the "alternative explanation" advanced by the defendants, i.e., that at the time of the IPO they knew of no "substantial likelihood" that LDK would take its furnace business elsewhere. The facts alleged in the complaint

---

[7]In this court's view, that is the strictest reading of the pleading standard even arguably supported by Twombly and Iqbal, so this court accepts that reading here without deciding whether it is necessarily the correct one. It is worth noting that then-Justice Souter, author of the majority opinion in Twombly, dissented from the majority opinion in Iqbal, arguing that "Twombly does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be." 129 S. Ct. at 1959 (emphasis added).

reasonably support the opposite inference, i.e., that the defendants were aware of such a likelihood.  The inference is by no means inescapable, but, as just discussed, Twombly and Iqbal did not equate "plausible" with "inescapable" or even "likely." Instead, dismissal for failure to state a claim is appropriate only if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  Iqbal, 129 S. Ct. at 1950.  That is the applicable standard.

## III. <u>Analysis</u>

### A.  **The statutory framework**

Section 11 provides that "[i]n case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security" may sue a variety of enumerated persons.  15 U.S.C. § 77k(a).  These include "every person who signed the registration statement," "every person who was a director . . . in the issuer at the time of the filing of the registration statement," and "every underwriter with respect to such security."  Id.  Here, all of the officers and directors named as defendants are alleged to have signed the prospectus,

and all of the banks named as defendants are alleged to have been underwriters of the IPO.

Section 11 also provides, however, that "no person, other than the issuer, shall be liable . . . who shall sustain the burden of proof" that, in relevant part, "he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, . . . that there was no omission to state a material fact . . . necessary to make the statements therein not misleading."  Id. § 77k(b)(3)(A).

Section 12(2), in relevant part, provides that any person who "offers or sells a security by the use of any means or instruments of interstate commerce or of the mails, by means of a prospectus . . . which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . . shall be liable . . . to the person purchasing such security from him."  15 U.S.C. § 77*l*(a)(2) (parentheticals omitted).  As this language suggests, the elements of a § 12(2) claim essentially mirror those of a § 11 claim, at least in all respects relevant here, where only the underwriters have been named as defendants to the § 12(2) claim. See, e.g., In re Tyco Int'l Ltd., 2004 DNH 154, 45-46.

12

Like section 11, section 12(2) allows a defendant to escape liability by "sustain[ing] the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of [the] untruth or omission."  15 U.S.C. § 77*l*(a)(2). Section 12(2) creates a further affirmative defense of "loss causation," i.e., "if the person who offered or sold [the] security proves that any portion or all of the amount recoverable . . . represents other than the depreciation in value of the subject security resulting from the part of the prospectus . . . with respect to which the liability of that person is asserted . . . then such portion or amount, as the case may be, shall not be recoverable."  Id. § 77*l*(b).

Finally, § 15 of the Securities Act provides that "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [15 U.S.C. §] 77k or 77*l* shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."  15 U.S.C. § 77*o*.  The complaint thus names the venture capital firm that owned 99.9% of GT Solar's voting stock at the time of the IPO, GT Holdings, as

well as other venture capital firms that allegedly "own and control" or manage GT Holdings, as defendants under § 15.

## B.    The defendants' arguments

The defendants seek dismissal of the complaint on a number of grounds.  First, as referenced above, they argue that the plaintiff has not pled facts sufficient to support an inference that they knew, at the time of the IPO, of a substantial likelihood that LDK would discontinue purchasing furnaces from GT Solar.  Second, the defendants argue that, even if they knew of that likelihood but failed to disclose it, the plaintiff has not pointed to any statement in the prospectus that was misleading as a result, particularly in light of the other "cautionary language" they identify.  Third, the defendants argue that the complaint demonstrates an absence of loss causation under 15 U.S.C. § 77*l*(b).  Fourth, the defendants argue that the complaint does not allege that the venture capital firms "controlled" GT Solar at the time of the IPO so as to render them liable for any deficiencies in the prospectus under § 15.  The court will address these arguments in turn.

### 1.    The defendants' knowledge

The defendants devoted much of their briefing, and nearly all of their presentation at oral argument, to the proposition that the plaintiff had not adequately alleged they knew, or had reason to know, that LDK would stop ordering DSS furnaces from GT Solar.  That focus is curious, to say the least, because "[n]either knowledge nor reason to know is an element in a plaintiff's prima facie case" under §§ 11 or 12(2) of the Securities Act.  Degulis v. LXR Biotechnology, Inc., Nos. 95-4204 et al., 1997 WL 20832, at *3 (S.D.N.Y. Jan. 21, 1997); see also, e.g., In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 274 n.7 (3d Cir. 2004); Hutchinson v. CBRE Realty Fin., Inc., ___ F. Supp. 2d ___, No. 03-1599, 2009 WL 2342768, at *8 (D. Conn. July 29, 2009); In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 343 (S.D.N.Y. 2003); In re Turkcell Iletisim Hizmetler A.S. Sec. Litig., 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001); In re WebSecure, Inc. Sec. Litig., 182 F.R.D. 364, 369-70 (D. Mass. 1998).  Instead, as the Supreme Court has held, section 11

> was designed to assure compliance with the disclosure
> provisions of the [Securities Act] by imposing a
> stringent standard of liability on the parties who play
> a direct role in a registered offering.  If a plaintiff
> purchased a security issued pursuant to a registration
> statement, he need show only a material misstatement or
> omission to establish his prima facie case.  Liability
> against the issuer of a security is virtually absolute,
> even for innocent misstatements.  Other defendants bear

15

the burden of demonstrating due diligence.  <u>See</u> 15
U.S.C. § 77k(b).

<u>Huddleston</u>, 459 U.S. at 382 (emphases added; footnotes omitted).[8]

So the defendants' point about what the plaintiff has not
alleged they knew is irrelevant to whether the complaint
adequately states claims against them under §§ 11 and 12.  At
most, it invokes the statutory defense of due diligence (or
reasonable investigation) on the part of the individual
defendants under 15 U.S.C. § 77k(b)(3)(A) (or § 77*l*(a)(2)), on
the theory that they had "reasonable ground to believe and did
believe . . . that there was no omission" from the prospectus (or
"did not know, and in the exercise of reasonable care could not
have known") of the substantial likelihood that LDK would go
elsewhere for its DSS furnaces.  Because section 11 places the
burden of showing due diligence on the defendants, however, it
cannot support their motion to dismiss unless "it is (1)
definitively ascertainable from the complaint and other sources
of information that are reviewable at this stage, and (2) [these]
facts establish the affirmative defense with certitude."
<u>Citibank Global Mkts., Inc. v. Rodríguez Santana</u>, 573 F.3d 17, 23

---

[8]"The phrase 'due diligence' does not appear in the
Securities Act, but two of the affirmative defenses available
under Section 11(b) are collectively known as the 'due diligence'
defense."  <u>In re WorldCom, Inc. Sec. Litig.</u>, 346 F. Supp. 2d 628,
662 (S.D.N.Y. 2004).

(1st Cir. 2009).  It is far from "definitively ascertainable" from the materials now before the court that the defendants' due diligence or reasonable investigation defenses have been established "with certitude."

First, the fact that LDK announced its contract to purchase DSS furnaces from GT Solar's competitor the very next day after the prospectus was filed creates an inference, at least, that the individual defendants knew--to say nothing of whether they had "reasonable ground to believe" or "could have known"--of a substantial likelihood that LDK would do so.[9]  Even in a case unlike this one, where a plaintiff must allege the defendants' actual knowledge of the undisclosed fact, "the short time frame between an . . . omission and a later disclosure of inconsistent information . . . provides some circumstantial factual support to be taken into account in determining whether the complaint pleads an adequate basis for inferring defendants' culpable knowledge." Shaw, 82 F.3d at 1225.  While a contrary inference is not beyond the realm of possibility, the exceedingly short time frame between the prospectus and LDK's announcement itself forecloses the conclusion "with certitude" that the defendants did not know,

_____

[9]It is important to note that the plaintiff does not fault the defendants for failing to predict that LDK would start buying furnaces from another supplier, but for failing to disclose the "substantial likelihood" of such a development.

and could not, in the exercise of due diligence or reasonable investigation, have known, of the information omitted from the prospectus, i.e., the substantial likelihood that LDK would not renew its commitment to purchase DSS furnaces from GT Solar.

Second, timing aside, the complaint marshals a number of other allegations further supporting the inference that the defendants knew, or could have known, of that likelihood. Among other things, the plaintiff has alleged that, prior to the IPO, a number of the defendants--including GT Solar's CEO and the members of its board of directors--reviewed a presentation that "indicated JYT was growing and threatening GT Solar's business," as well as that GT Solar employees had "raised concerns that LDK was 'upset' with GT Solar's products."

The defendants point out that these, as well as a number of other allegations which also might support the inference that the defendants appreciated a substantial risk of LDK's taking its business elsewhere, are based on statements by "confidential witnesses" who used to work for GT Solar, arguing that "[r]eliance on such unnamed and unsubstantiated sources cannot meet Plaintiff's burden under Rule 9(b)." Putting aside the fact that Rule 9(b) does not apply here, see Part II, supra, the court of appeals has, even in such cases, "decline[d] to adopt a rule which would exclude confidential source allegations which have

18

every indication both that the source had access to information and that the information has the earmarks of credibility, simply because the identity of the source is not initially revealed." N.J. Carpenters, 537 F.3d at 52 (footnote omitted).

While perhaps not all of the plaintiff's confidential source allegations pass this test, those just described do, given "the level of detail provided by the confidential sources, the corroborative nature of the facts other alleged, [and] the coherence and plausibility of the allegations." Id. at 51 (parenthetical omitted). Indeed, the confidential source of each of those tidbits--that the CEO and board of directors were briefed on the threat posed by JYT, and that GT Solar employees had expressed concern to management over LDK's dissatisfaction-- professed personal knowledge of those events. These allegations, then, are more than adequate at this stage to bolster the inference that the defendants knew or should have known of the risk of LDK's imminent switch to a different vendor. And that inference, in turn, is more than adequate to prevent a successful due diligence or reasonable investigation defense on the basis of the complaint and other materials cognizable on a motion to dismiss.[10]  See, e.g., In re Enron Corp. Sec., Derivative &

---

[10]This is true despite the defendants' point, stressed at oral argument, that LDK's 2007 annual report noted obligations to GT Solar for furnaces to be delivered in 2008 and 2009, as well

"ERISA" Litig., No. MDL-1446, 2005 WL 3704688, at *19 ("arguments
. . . based on due diligence . . . are clearly not properly
raised [in] a 12(b)(6) motion").

### 2.   Misleading statements in the prospectus

"The proposition that silence, absent a duty to disclose,
cannot be actionably misleading[] is a fixture in federal
securities law . . . .  [T]he mere possession of material
nonpublic information does not create a duty to disclose it."
Shaw, 82 F.3d at 1202.  So the plaintiff cannot premise its
claims under §§ 11 and 12(2) on the simple fact that the
prospectus failed to mention the substantial likelihood that LDK
would leave for another supplier of DSS furnaces; the defendants
must also have been under a duty to disclose that information.
To this end, the plaintiff argues that, by not speaking of LDK's
probable departure in the prospectus, the defendants "omitted to
state a material fact 'necessary to make the statements therein

---

as ongoing research and development efforts between the
companies.  See note 3, supra.  At this stage, it is sufficient
to note that LDK's annual report was issued some three and one-
half months before GT Solar's prospectus and LDK's immediately
subsequent announcement that it had committed to buying furnaces
from JYT through 2010.

not misleading,'" <u>id.</u> at 1204 (quoting 15 U.S.C. § 77k(a)),

specifically, the statements listed in Part I, <u>supra</u>.[11]

---

[11]The plaintiff's objection to the motion to dismiss--but
not the complaint--argues another source of the defendant's duty
to disclose, a Securities and Exchange Commission rule known as
"Item 303."  <u>See</u> 17 C.F.R. § 229.303.  Part of Regulation S-K,
which dictates the content of registration statements, <u>see</u> <u>id.</u>
§ 229.10(a)(1), Item 303 requires them, in relevant part, to
"[d]escribe any know trends or uncertainties that have had or
that the registrant reasonably expects will have a material
favorable or unfavorable impact on net sales or revenues or
income from continuing operations."  <u>Id.</u> § 303(a)(3)(ii).  As the
plaintiff points out, the SEC has interpreted this rule to
require disclosure of "the likely non-renewal of a material
contract."  <u>Management's Discussion and Analysis of Financial
Condition and Results of Operations</u>, Release No. 6835, 43 SEC
Docket 1330, 1989 WL 1092885, at *4 (May 18, 1989).  Thus, the
plaintiff argues, Item 303 gave the defendants a duty to disclose
the substantial likelihood that LDK would not continue buying DSS
furnaces from GT Solar, without regard to whether the
nondisclosure would have made any statements in the prospectus
misleading.  <u>See</u> <u>Shaw</u>, 82 F.3d at 1204-05 (explaining that a
nondisclosure in violation of Item 303 supports a claim under
§§ 11 and 12(2) that a prospectus "omitted to state a material
fact required to be stated therein").
        The court of appeals, however, has interpreted the "known
trends and uncertainties" language of Item 303 "as referring to
those trends discernible from hard information alone."  <u>Glassman
v. Computervision Corp.</u>, 90 F.3d 617, 631 (1st Cir. 1996).
Though, as just discussed, the complaint pleads facts supporting
the inference that the defendants knew or had reason to know that
LDK's discontinuance of its purchases of DSS equipment from GT
Solar was substantially likely, those facts would not appear to
constitute the "hard information" contemplated by <u>Glassman</u>, and
the plaintiff does not argue to the contrary.  But, because the
plaintiff has successfully pled claims for the nondisclosure
based on the allegedly misleading statements in the prospectus,
the court need not--and does not decide--whether the plaintiff
has also pled a nondisclosure claim based on Item 303.

The defendants counter that none of those statements was
misleading because they were (1) simply accurate statements of
historical fact carrying no implication about the future,
(2) accompanied by cautionary language sufficient to negate any
such implication regardless, and (3) "inactionable puffery."  As
explained below, the court finds these arguments unconvincing, at
least at this stage.  Because "[t]he existence of a material
omission is usually a question for the trier of fact," securities
fraud claims should not be dismissed for failure to plead that
element unless the court can "say as a matter of law the
complaint fails to raise a reasonable inference that [there] was
a material omission."  Miss. Pub. Employees' Ret. Sys. v. Boston
Scientific Corp., 523 F.3d 75, 87 (1st Cir. 2008).  The court
cannot reach that conclusion here, even though none of the
statements seized upon by the plaintiff may have been blatantly
misleading.

First, the defendants are correct that "accurate reports of
past successes do not themselves give rise to a duty to inform
the market whenever present circumstances suggest that the future
may bring a turn for the worse."  Shaw, 82 F.3d at 1202 (citing
Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st

Cir. 1994)).  With one exception,[12] though, the statements at issue are not "accurate reports of past successes."

To the contrary, the statements--"our DSS unit <u>is</u> a market leading product," "our DSS units <u>are</u> the most widely used furnace for casting multicrystalline ingots in the solar industry," and "our installed base of DSS units and other PV equipment <u>promotes</u> recurring sales of additional equipment" (emphases added)--are "representation[s] of present fact," which, as the court of appeals recognized in <u>Shaw</u>, can give rise to a duty to disclose. <u>Id.</u> at 1213; <u>cf.</u> <u>Zouras v. Hallman</u>, 2004 DNH 144, 35 (dismissing securities fraud claim based on a statement that, in the prior quarter, the company "experienced volume increases in sales" of a product line because this statement "may well have reaffirmed the growing success of the . . . product line, but [it] did so by reporting past results") (internal quotation marks omitted).

_____

[12]The statement that "[d]uring the fiscal year ended March 31, 2008, one customer, LDK Solar Co., accounted for 62% of our revenue" undisputably fits the category of "accurate reports of past successes" which, as a rule, do not give rise to a duty to disclose that "present circumstances are less rosy." <u>Serabian</u>, 24 F.3d at 361.  But the court of appeals has nevertheless recognized that "'if defendant's apprehension was of a disaster the rule might be different.'" <u>Id.</u> 361 n.4 (quoting <u>Capri Optics Profit Sharing v. Digital Equip. Corp.</u>, 950 F.2d 5, 8 (1st Cir. 1991)).  Whether GT Solar's loss of DSS furnace business from its biggest customer amounted to a "disaster" in this sense need not be decided at the moment because, as discussed <u>infra</u>, the other statements identified by the plaintiff could have given rise to a duty to disclose the risk of that development.

The court in <u>Shaw</u> identified a "representation of present fact" in the statement "the remaining restructuring reserve of $443 million is adequate to cover presently planned restructuring actions," namely, that the issuer "had no current intent to undertake activities that would require any such restructuring charges to be taken."  82 F.3d at 1213.  Furthermore, the court found that the statement also had "a forward-looking aspect" in suggesting that the issuer "would take no further restructuring charges in the near-term future."  <u>Id.</u>

So the court reasoned that, in either its present or future orientation, the statement could have been misleading, in light of the issuer's failure to disclose either that "further restructuring actions would be necessary to put the company back on track after its impending third quarter setback" or that "performance in the third quarter would precipitate actions on a scale and on a schedule that would necessitate the taking of additional restructuring charges."  <u>Id.</u> at 1213-14.  The court reached this conclusion, moreover, despite the issuer's argument that, at the time of the statement, the third quarter had yet to close.  <u>Id.</u> at 1209-10.  By the same reasoning, then, the statements in GT Solar's prospectus about the market-leading position of the company's DSS furnace and its promotion of recurring sales could be considered misleading in light of the

24

undisclosed risk that the product would very soon lose its spot atop the market, and a large portion of its recurring sales, as a result of LDK's impending departure--even though, at the time of the prospectus, LDK had not publicly announced that move.[13]

This is not to say that simply mentioning the DSS furnace in the prospectus would have been misleading in light of the alleged nondisclosure, because the federal securities laws do not require that, "by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise." Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc).  Those laws do demand, however, the disclosure of any other facts "that are needed so that what was revealed would not be 'so incomplete as to mislead.'"  Id. (quoting SEC v. Tex. Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968)).  So the statements about the present success of GT Solar's DSS furnaces, coming as they did just hours before the company's biggest customer for that product publicized its decision to switch to another supplier, "might well be found to be a material misrepresentation by half-truth and incompleteness."  Id.; see also In re Cabletron Sys., Inc.,

_____

[13]The court notes that, while "forward-looking statements" are generally insulated from liability as a result of the "safe harbor" provision of the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, tit. I, § 102(a), 109 Stat. 749, 750 (codified at 15 U.S.C. § 77z-2(c)(1)), that provision, by its terms, does not apply to such statements "made in connection with an initial public offering," 15 U.S.C. § 77z-2(b)(2)(D).

25

311 F.3d 11, 36 (1st Cir. 2002) (ruling that a manufacturer's statements about the availability of one of its products could have been misleading in "creat[ing] the impression that [it] was already commercially available on a large scale").

Second, the cautionary language in the prospectus was not necessarily sufficient as a matter of law to purge the statements at issue of their claimed tendency to mislead.  Under what has become known as the "'bespeaks caution'" doctrine, "if a statement is couched in or accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that the statement was materially misleading because it gave rise to that very inference may fail as a matter of law."  Shaw, 82 F.3d at 1213 (citing In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 364 (3d Cir. 1993)). But the "bespeaks doctrine provides [the] basis for dismissal as a matter of law 'only when reasonable minds could not disagree as to whether the mix of information in the allegedly actionable document is misleading.'"  Id. at 1214 (quoting Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995)) (bracketing omitted).

Here, the cautionary statements identified by the defendants leave room for reasonable debate as to whether, despite their inclusion in the prospectus, it remained misleading in its exclusion of any reference to the substantial risk that LDK would

26

no longer rely on GT Solar as a source of DSS furnaces.  As recounted in Part I, _supra_, the prospectus mentioned the "risk that existing customers will elect not to do business with us in the future," warned against the "assurance that DSS sales will increase beyond, or be maintained at past levels" in light of, _inter alia_, "competing product offerings by other [photovoltaic] manufacturers," and noted products liability and warranty claims against the company.  While these remarks allude to the chance of discontinued customer relationships and decreased sales, their lack of specificity as to the seriousness and immediacy of such threats prevents them from cloaking the prospectus in the bespeaks caution doctrine as a matter of law.

For that to occur, as the court of appeals has instructed, cautionary statements must "provide an unambiguous warning of the possibility" the prospectus allegedly failed to disclose.  _Shaw_, 82 F.3d at 1214.  There, where the registration statement was allegedly misleading because it "implie[d] a hiatus on new restructuring charges for the near future," the court ruled that the issuer's statement, "The Corporation will continue to take actions necessary to achieve a level of costs appropriate for its business," failed to "warn[] against such an implication with sufficient clarity to bespeak caution" as a matter of law.  _Id._ at 1212-13.  Likewise, GT Solar's generalized statements about

27

potential lost customers and sales did not specifically warn
against the implication that it would very soon lose its biggest
customer for DSS furnaces and, with it, most of that product's
sales.  "'The doctrine of bespeaks caution provides no protection
to someone who warns his hiking companion to walk slowly because
there might be a ditch ahead when he knows with near certainty
that the Grand Canyon lies one foot away.'"  Rombach v. Chang,
355 F.3d 164, 173 (2d Cir. 2004) (quoting In re Prudential Secs.
Inc. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996)).

Third, the defendants are wrong to characterize the
allegedly misleading statements as "inactionable puffery," i.e.,
"loosely optimistic statements that are so vague, so lacking in
specificity, or so clearly constituting the opinions of the
speaker, that no reasonable investor could find them important to
the total mix of information available."  Shaw, 82 F.3d at 1217
(footnote omitted).  The defendants do not explain how the
statements at issue fit that description, and the proposition is
not readily apparent to the court.  It would also appear
irreconcilable with the defendants' position, discussed supra,
that the very same statements are "accurate statements of
historical fact" (emphasis added).  While, as also discussed
supra, the court disagrees that the statements are historical (in
the relevant sense), it agrees that they are factual.

28

For example, "our DSS unit is a market-leading product" is a specific representation of fact because, to quote again from the defendants' memorandum, "'market-leading' products garner the highest sales revenue in a particular market" (footnote, citing dictionary definitions of "market leader," omitted).  The same is true of the statements "our DSS units are the most widely used furnace for casting multicrystalline ingots in the solar industry"--they either are or they aren't--and "our installed base of DSS units and other PV equipment promotes recurring sales of additional equipment"--it either does or it doesn't, as the defendants also acknowledge in making their "historical fact" argument.  So the "statements cannot accurately be described as the kind of diffuse expression of opinions or optimism that can be deemed, by their nature, obviously immaterial as a matter of law."  Shaw, 82 F.3d at 1219.[14]  In sum, the court cannot say as a matter of law, based on what is now before it, that the statements at issue were not materially misleading absent the

_____

[14]The court acknowledges that each of the complained-of statements was prefaced by the phrase "we believe."  But this shibboleth does not magically transform the recitations of fact that follow into statements of opinion.  That much is clear from the decision in Shaw, where the court found that liability under §§ 11 and 12(2) could follow from a statement initiated with "The Corporation believes."  82 F.3d at 1211-14.  The defendants do not argue to the contrary.

disclosure of the substantial risk that LDK would stop buying DSS furnaces from GT Solar.

### 3.  Loss causation

As noted in Part III.A, <u>supra</u>, § 12(2) has a built-in affirmative defense of "loss causation:"  "if the person who offered or sold [the] security proves that any portion or all of the amount recoverable . . . represents other than the depreciation in value of the subject security resulting from the part of the prospectus . . . with respect to which the liability of that person is asserted . . . then such portion or amount, as the case may be, shall not be recoverable."  15 U.S.C. § 77*l*(b). And, as noted in Part III.B.1, <u>supra</u>, an affirmative defense cannot justify dismissing a complaint under Rule 12(b)(6) unless it is both "definitively ascertainable" from and "conclusively established" by materials cognizable at the pleadings stage. Undaunted, the defendants argue loss causation as a basis for dismissal because "it is apparent from the Complaint's face that the purported truth's disclosure to the market did not cause a significant fall in share price."

This argument is a non-starter.  The complaint alleges that, after the United States markets opened on the very day that LDK publicly announced its contract to purchase furnaces from JYT, GT

Solar's share price fell from its offering price of $16.50, to a low of $9.30, before closing at $12.59, in trading 15 times the average volume of GT Solar since.  Given this chronology, the possibility that the stock's loss on that day "represents other than the depreciation in value of the subject security resulting from the part of the prospectus . . . with respect to which . . . liability . . . is asserted," i.e., its nondisclosure of the substantial risk that LDK would jettison GT Solar as a supplier of furnaces, is difficult to conceive, let alone "definitively ascertainable" and "conclusively established."  The defendants' loss causation argument cannot support dismissal.

### 4.    Controlling person liability

Finally, the venture capital funds named as defendants argue that the complaint fails to allege they "controlled" any of the other defendants so as to make the funds liable under § 15, as discussed in Part III.A, <u>supra</u>.  As the funds correctly point out, for § 15 liability to attach, "the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company," so that "[i]n the absence of some indicia of the <u>exercise</u> of control over the entity primarily liable, . . .

[majority shareholder] status alone is not enough." <u>Aldridge v. A.T. Cross Corp.</u>, 284 F.3d 72, 85 (1st Cir. 2002).

The funds' argument might have some force, then, if GT Solar were the only person allegedly liable under §§ 11 or 12(2) whom the funds allegedly controlled. But the complaint also claims that the funds "did in fact influence and control, directly or indirectly, the decision-making" of two of their employees and agents who, as members of GT Solar's board, signed the prospectus. By virtue of doing so as alleged, those individuals are liable for any omission in the prospectus in violation of § 11, 15 U.S.C. § 77k(a), and the funds, in turn, are jointly and severally liable for the violations by those controlled persons under § 15, <u>id.</u> § 77*o*--without regard to whether the funds could also be liable under § 15 for controlling GT Solar itself.

The funds do not argue that the complaint fails to allege that they controlled the directors in question for purposes of § 15; instead, they argue that the complaint fails to allege that the directors controlled GT Solar, but that is again irrelevant at this point because the directors are themselves directly charged with liability under § 11.[15] At this stage, then, the defendants' control person argument cannot support the funds'

---

[15]Nor do the funds argue that, given their organizational structure, any one of them is not a proper defendant here because that entity in particular did not control the directors.

dismissal from the case.  See, e.g., Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223, 246 (D. Mass. 2004) (refusing to dismiss control person claim against employer based on employee's alleged securities law violations where it was "undisputed" that the employer possessed and exercised the power to control him).

## IV.   Conclusion

For the foregoing reasons, the defendants' motion to dismiss[16] is DENIED.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  October 7, 2009

cc:  Christopher Cole, Esq.
     Mark L. Mallory, Esq.
     Edward F. Haber, Esq.
     Michelle H. Blauner, Esq.
     Christopher D. Hawkins, Esq.
     William L. Chapman, Esq.
     Jamie N. Hage, Esq.
     Daniel S. Sommers, Esq.
     Matthew K. Handley, Esq.
     Steven J. Toll, Esq.
     Kenneth G. Bouchard, Esq.
     Mark Punzalan, Esq.

_____

[16]Document no. 67.

C. Kevin Leonard, Esq.
David P. Slawsky, Esq.
Lawrence A. Vogelman, Esq.
Christopher B. Zimmerman, Esq.
James W. Prendergast, Esq.
Jeffrey B. Rudman, Esq.
W. Daniel Deane, Esq.
W. Scott O'Connell, Esq.
William H. Paine, Esq.
B. Andrew Bednark, Esq.
Bradley J. Butwin, Esq.
William J. Sushon, Esq.
Edmund J. Boutin, Esq.
John L. Altieri, Jr., Esq.